**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

PC CONNECTION, INC.,

        Plaintiff,

        v.                                          No.

REBECCA WITTS and CLUTCH
SOLUTIONS, LLC,

        Defendants.

<u>**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**</u>

<u>**INTRODUCTION AND NATURE OF THE ACTION**</u>

1.     This is an action for injunctive relief, damages, and other relief arising out of Defendant Rebecca "Becky" Witts' ("Witts") breach of contract, and her employer, Defendant Clutch Solutions, LLC's ("Clutch") tortious interference with contractual relations.

2.     Until recently, Witts was employed by PC Connection, Inc. ("Connection") as a Senior Executive Account Manager ("AM").   At Connection, Witts was responsible for supporting, nurturing, maintaining and developing new business in her accounts. She was tasked with meeting and exceeding revenue and profit targets via sales of all relevant hardware, software, and any and all services and solutions that Connection's customers may need.   The customers for whom she was responsible totaled revenue well in excess of $5,000,000.  In her AM position, Witts played a significant role in Connection's sales process, on behalf of Connection developed critical and long-term relationships with Connection's customers, potential customers and strategic vendor partners and became intimately familiar with

Connection's confidential and proprietary information, including its methodologies and business strategies.

3.      At the inception of her employment with Connection, and as a condition of her employment with Connection, Witts executed a Covenant Not to Compete and Disclose Confidential Information and Assignment of Rights (the "Agreement") that imposes an 18-month restriction on her post-employment solicitation of Connection's customers, or employees, and on her ability to compete against Connection.  The Agreement also prohibited Witts from using Connection's confidential information and/or trade secrets (as defined in the Agreement) and obligates Witts to return to Connection, immediately upon termination of her employment, all documents and other property of Connection. A copy of the Agreement is attached as <u>Exhibit A</u>.

4.      Witts violated her Agreement with Connection when, after her resignation from Connection began to work for Clutch, a direct competitor of Connection, in a sales role, in violation of numerous terms of the Agreement.  Upon information and belief, Witts has used and/or will use the Connection Confidential Information she took with her when she left Connection, on behalf of Clutch.

5.      Witts continues to breach the Agreement by remaining employed by Clutch and, on behalf of Clutch, continuing to solicit Connection customers and employees.

## **PARTIES**

6.      Plaintiff Connection is a Delaware corporation with a principal place of business in Merrimack, New Hampshire.

7.      Defendant Rebecca Witts is a resident of Greer, South Carolina.

8.      Defendant Clutch Solutions, LLC is an Arizona limited liability company with a principal place of business in Mesa, Arizona. Clutch is comprised of two members, Scott Gossett and Garrette Backie who, on information and belief, are both residents of Arizona.

## JURISDICTION, VENUE AND APPLICABLE LAW

9.      The Court has personal jurisdiction over Witts because she transacted business within New Hampshire and committed tortious acts within New Hampshire. RSA 510:4 (I).

10.     The Court has personal jurisdiction over Clutch because it committed tortious acts within New Hampshire. RSA 510:4 (I).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this jurisdiction.

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000.00 exclusive of interests and costs and is between citizens of different states.

13.     The Agreement was executed in New Hampshire and calls for the application of New Hampshire law to any dispute regarding the Agreement.  Exhibit A.

## FACTS

### Connection's Business

14.     Connection was founded in 1982, as the personal computer industry was emerging, to provide customers with a better way to purchase information technology products and services.  Since its founding Connection has grown to become a publicly traded Fortune 1000 company.

15.     Connection is headquartered in New Hampshire and has over 2,000 employees nationwide.

16.     Connection sells computers, software and related products and services nationally to businesses of all sizes and to government agencies.

17.     Connection works with current and potential customers to recommend appropriate products and services.   This process requires extensive interaction between Connection's employees and its customers and potential customers.   Connection will gather information regarding the potential customer, their needs, budget and future business plans.   This information is used to provide recommendations to the customers and potential customers.

18.     After a sale is made, Connection continues to work with the customer to provide training and ongoing support to ensure that the products and services are implemented correctly.

19.     Many companies purchase products and services on a regular, cyclical, basis.   For this reason, Connection expects and encourages those employees who work with customers to provide advice on product and service optimization to develop close and long-term relationships with the individuals responsible for purchasing decisions.   Connection's business model relies on the development of long-term customer relationships in which the customers come to rely on the service and advice provided by Connection.

20.     While other companies also provide advice to clients on the purchase of products and services, Connection is one of a limited number of companies that has been regularly recognized for its superior sales strategy.   Connection has invested significant resources in developing the expertise necessary to provide purchasing advice and in a methodology that allows Connection to provide better advice than its competitors.

### Witts's Employment with Connection

21.     By letter dated October 27, 2003, Connection offered Witts employment as an Account Manager, with a start date of November 3, 2003.

22.     As set forth in her employment offer letter, Witts was required to sign the Agreement as a condition of his employment.  The Agreement was referenced and attached to the offer letter, which was provided approximately one week before the projected start date.

23.     Witts accepted Connection's employment offer on October 29, 2003 and executed the Agreement in New Hampshire on November 3, 2003.  See Exhibit A.

24.     Witts commenced employment with Connection on November 3, 2003.

25.     As an Executive Account Manager, Witts worked directly with Connection's customers and potential customers regarding the purchasing of Connection products and services.  Connection has dozens of customers in these states for which Witts was responsible, with revenue from such customers well in excess of $5,000,000.

26.     Witts' work was a critical component of Connection's sales of products and services to customers and potential customers in the Northeast region, including orders by individual customers resulting in over $5 million of revenue dollars.

27.     During her employment with Connection, Witts obtained detailed knowledge of confidential information regarding Connection's overall business practices related to sales, including its pricing structure and strategies and how business opportunities were approached. The information that Witts had access to was not shared with customers and was not fully disclosed to customers or potential customers during the sales process.

28.     During her employment with Connection, including shortly before she voluntarily ended her employment in 2022, Witts had access to Connection's confidential information regarding its customers, vendors, and cost and price information, including information concerning discounts Connection was able to obtain from vendors and benefited from Connection's customer good will developed by her with clients she worked with.

29.     Over many years and continuing to date, Connection has invested millions of dollars in developing its confidential information related to its business practices.

30.     On July 16, 2020, Connection approved Witts' request to work remotely from South Carolina, which Witts requested in order to be closer to her family in Tennessee.

**The Agreement**

31.     The Agreement between Witts and Connection provides, in relevant part:

**1.  NO COMPETITTION WITH PC CONNECTION.**

(a)     While employed by any of the PC Connection companies, Employee shall not own, manage, operate, control, consult for, aid or be employed by any entity that is substantially similar to or directly competes with any business conducted by PC Connection, including, but not limited to, the design, development and production of the particular projects Employee will have worked on or been involved with.

(b)     For the period of eighteen (18) months following any termination of employment for any reason or for no reason, Employee, either as an employee of another entity, independently or otherwise, shall not compete with PC Connection by (i) engaging in the design, development, production, marketing or sale of goods or services directly in competition with PC Connection or engaging in projects substantially similar to those Employee worked on or was involved with on behalf of PC Connection, whether or not the projects, in whole or in part, involved confidential information or trade secrets, (ii) soliciting sales in competition with PC Connection from PC Connection's established customers with whom Employee had other than incidental contact during his or her employment with PC Connection or (iii) soliciting other employees to leave PC Connection in order to undertake other employment.

. . .

**2.  NO DISCLOSURE OF TRADE SECRETS AND CONFIDENTIAL INFORMATION.**

(a)     Employee acknowledges that some elements of PC Connection's business constitute trade secrets, are and must remain confidential, and are of value to PC Connection, and that unauthorized disclosure of such elements will cause PC Connection irreparable harm.  PC Connection's trade secrets and/or confidential information include but are not limited to: identities  of customers,

customer lists and other information about customers used by PC Connection, sales, marketing and financial information, designs, diagrams, schematics, plans, specifications, and other technical information, oral and written agreements with vendors and distributors, pricing methods, purchasing and sales contacts, computer programs, sales figures and PC Connection's short range and long range product, sales, marketing, expansion, diversification, financing and similar plans, regardless of whether stored in any tangible medium or of the type of medium in which it is stored, used or contained and whether contained in created materials reflecting such information, excepting information which is generally known outside PC Connection or which becomes generally known outside PC Connection by publication other than by or as a result of an unauthorized act or omission by or involving the Employee or another. Created materials include any documents, memoranda, notes, notebooks, reports, studies, programs, data, drawings, schematics, ideas, discoveries and any other item of information generated by or for PC Connection stored or contained in any medium, including materials that Employee created individually or together with others whether during or outside of regular working hours so long as they were created for the benefit of PC Connection or by utilizing Company time, resources, materials or information.

(b)     Employee shall not disclose trade secrets or confidential information to anyone except authorized Company officers, agents and employees, unless specifically directed by an officer of PC Connection.

(c)     Employee shall deliver to PC Connection all confidential information, created materials and trade secrets, whether written or contained in any other medium, which are in his or her possession or under his or her control, promptly upon request. Employee shall not take any confidential information, created materials and trade secrets, whether written or contained in any other medium, or hardware outside PC Connection's premises without the express consent of an officer of PC Connection and shall return all such things promptly upon termination of employment with PC Connection.

(d)     Employee acknowledges that the obligation not to disclose confidential information and trade secrets is a continuing one, which shall remain in force and binding upon the employee after his employment with PC Connection is terminated for any reason and until such time as the information is no longer confidential and does not constitute a trade secret.

. . .

4. **INJUNCTIVE RELIEF.**

In the event Employee breaches any of the foregoing provisions, PC Connection will suffer irreparable harm and shall be entitled to injunctive relief.

5. **CONSIDERATION.**

The consideration for Employee's obligations under this Covenant include one or more of the following: PC Connection (a) hiring Employee, (b) providing continued employment in one or more of the PC Connection, Inc. group of companies, (c) granting Employee a promotion and/or pay increase.

6. **GENERAL.**

This Covenant represents the entire agreement between the parties relating to the subject matter covered, and may not be modified except by a writing signed by both parties. This Covenant shall inure to the benefit of PC Connection, its successors and assigns. If any provision in this Covenant is deemed illegal or unenforceable, the offending provision shall either be modified to make it legal and enforceable while retaining as far as possible the original intent of the provision or, if that is not possible, it shall be stricken; the remainder of the Covenant to continue in full force and effect. This Covenant shall be construed and enforced under and in accordance with the law of the State of New Hampshire.

## <u>Witts Resigns and Accepts Employment with a Direct Competitor</u>

32.     After almost 19 years of employment, Witts abruptly and without prior notice notified Connection on April 18, 2022 that she was voluntarily resigning employment. Connection received no forewarning of Witts' intention to resign and had not received any concerns from Witts related to her purported reasons for resignation.

33.     Witts gave Connection only five days' notice of her resignation with her desired last day of employment to be April 22, 2022.

34.     On April 18, in writing and verbally, Witts represented to Connection that she was leaving Connection in order to take "some time off to re-energize myself and my well-being,

as I have become mentally drained over the last two years and need a serious break." Witts thanked Connection for "a wonderful experience" which lasted over "the last 18+ years."

35.    Due to the rapid timeline of her departure, Connection could not obtain a customary "warm handoff," in which the departing employee contacts their clients to introduce them to Connections staff who would be handling the account going forward.

36.    During her exit interview with HR Business Partner Kelly Allen on April 20, 2022, Witts reiterated that her resignation was due to alleged work stress and the need to take time for herself. She stressed that she was not leaving to take another job and would be taking time for her own wellbeing. Witts stated that she was not actively looking for a job with another company.

37.    At the April 20 exit interview, Connection reminded Witts of the restrictions imposed by the Agreement, which Witts acknowledged.

38.    At no point did Witts disclose to Connection that she was employed or would be employed by Clutch in any capacity.

39.    Clutch is a direct competitor to Connection and advertises itself as "focused on IT modernization, performance enhancing and cyber security offerings and related professional services[.]" Clutch Solutions has offices in Mesa, Arizona and Kirkland, Quebec.

**Connection's Discovery of Defendants' Unlawful Activity**

40.    Within days of her resignation, Connection learned that Witts had obtained employment in sales with Clutch, a direct competitor. This employment is in breach of Witts' Agreement with Connection.

41.     Connection has learned that Witts' name is listed on the public-facing telephone directory of Clutch employees maintained by Clutch, indicating that she immediately began work with Clutch following her resignation.

42.     As a Clutch employee, Witts has solicited Connection's current customers who she previously served as a Connection employee, conduct explicitly forbidden by the Agreement.

43.     Witts has solicited at least three Connection customers on behalf of Clutch, referred to here as Customer X, Customer Y, and Customer Z.[1]

44.     On April 28, 2022, Witts copied her former Connection email address on a communication to Customer X transmitting a quote for computer monitors. See Exhibit B. Witts had previously served Customer X as a Connection AM.

45.     The Customer X quote directly evidences Witts' breach of both her noncompetition and nonsolicitation obligations under the Agreement.

46.     On May 11, 2022, Connection learned from a vendor, Vendor A, that Witts and Clutch are actively soliciting Customer Z, a Connection customer previously serviced by Witts. Witts contacted Vendor A seeking to transfer business previously registered by Connection with Vendor A in the form of a "deal registration." Vendor A then informed Connection that Witts had contacted it seeking to transfer this deal registration from Connection to Clutch. Vendor A's communication with Connection is attached hereto as Exhibit C.

47.     As an Executive Account Manager, Witts was the "face" of Connection to Company clients and possessed client good will on Connection's behalf.

---

[1] Connection is withholding customer and vendor names in order to preserve confidentiality, but can make the names of such entities known to court for in camera review, and to Defendants' counsel pursuant to appropriate confidentiality protections.

48.     Witts had access to Connection's confidential information including but not limited to the identity of clients, information concerning clients' business, and information concerning vendor and vendor pricing.

49.     This information is protected by the trade secrets and confidential information provisions of the Agreement. The use of this information for the benefit of Clutch is forbidden.

50.     In light of Witts' misrepresentations to Connection at the time of her resignation, her concealing her employment with Clutch, and her solicitation of Connection customers on behalf of Clutch immediately after commencing employment there, Connection believes Witts is utilizing its protected information and good will for the benefit of Clutch, including but not limited to for the purposes of poaching Connection customers.

## Clutch's Ongoing Interference with Connection

51.     Clutch's behavior in hiring Witts in violation of her Agreement and utilizing her wrongfully to solicit Connection's customers on its behalf is not an isolated or unintended act.

52.     On October 13, 2021, counsel for Connection wrote a letter to Clutch concerning its conduct regarding another former Connection employee, Amy Luongo, who was hired by Clutch.

53.     Luongo, who had worked as an Account Manager at Connection, resigned her employment with Connection effective September 1, 2021. Shortly thereafter, Luongo became employed by Clutch. Connection learned that Luongo had solicited Connection customers and employees on behalf of Clutch in violation of her non-solicitation agreement with Connection.

54.     The letter placed Clutch on notice that Connection's account managers were subject to post-employment obligations owed to Connection. Clutch knew or should have known that Witts, like Luongo, was restricted from soliciting Connection's customers or employees.

55.     On February 22, 2022, Connection filed suit against Luongo in Merrimack County Superior Court seeking relief for her ongoing breach of contract, acts taken on behalf of Clutch and in spite of her ongoing obligations owed to Connection.

56.     Clutch is aware of the Luongo lawsuit and the allegations in Connection's complaint. On April 7, 2022, Connection served a subpoena *duces tecum* on Clutch seeking documents concerning Clutch's efforts, through Luongo and others, to solicit Connection customers and employees.

57.     Both the correspondence from counsel and this subpoena were served on Clutch prior to Witts' resignation from Connection. Clutch was therefore aware of Witts' obligations to Connection at all times pertinent to this Complaint and prior to her employment with Clutch.

## COUNT I
## <u>Breach Of Contract</u>
### (Witts)

58.     Connection restates and incorporates by reference all of the previous allegations herein as if set forth fully herein.

59.     Witts entered into the Agreement, as described above, for good consideration.

60.     The Agreement is an enforceable contract between Connection and Witts.

61.     Witts has materially breached and/or will materially breach the Agreement by, among other things:

    a.   seeking and accepting subsequent employment, including in a sales capacity, from Clutch, a direct competitor of Connection;

    b.   directly or indirectly soliciting Connection's customers and/or prospective customers;

    c.   using and/or disclosing Connection Confidential Information on behalf of Clutch.

62.     Further, by providing services to Clutch, Witts has and/or will inevitably breach her Agreement not to divulge Connection's Confidential Information.

63.     Connection may learn of additional breaches of contract by Witts during discovery and reserves its right to amend this Complaint and/or recover for any further breach of the Agreement by Witts.

64.     Witts' breach of the Agreement was, is and/or will be a substantial factor in directly and proximately causing damages and irreparable harm to Connection.  The amount of damages cannot reasonably be ascertained at present but has and will exceed $75,000.  Specifically, the yearly revenue from the customers for which Witts was responsible is well in excess of $1,500,000, therefore the loss of even a very small percentage of such revenue as a result of Witts' actions would easily satisfy the $75,000 amount in controversy standard.  Likewise, the misuse by Witts on behalf of Clutch of Connection's Confidential Information will also easily satisfy the $75,000 amount in controversy standard.  Connection will be, has been and/or continues to be irreparably harmed by Witts' actions.

65.     Unless restrained by this Court, Witts will continue her unlawful actions and Connection will continue to be irreparably harmed.

66.     Connection will not have an adequate remedy at law for the harm and damage which Witts' breach of her Agreement will cause and is entitled to a preliminary and permanent injunction, enjoining Witts from further unlawful acts.

**COUNT II**
**Tortious Interference with Contractual Relations**
**(Clutch)**

67.     Connection has an economic relationship with Witts, employing her for over 18 years and executing the Agreement with her concerning her post-employment obligations.

68.     Connection has an economic relationship with Luongo, employing her for over eight years and executing an agreement with her concerning her post-employment obligations.

69.     Clutch knew and/or should have known that Witts and Luongo were bound by agreements due to its awareness of ongoing litigation with Luongo concerning Luongo's breach of her post-employment contractual obligations to Connection.

70.     Clutch intentionally and improperly inferred with this relationship by employing Witts and Luongo in violation of their respective agreements, of which it was aware, and by allowing Witts and Luongo to, on Clutch's behalf, compete with Connection and solicit Connection customers and/or employees in violation of their agreements.

71.     Clutch's tortious interference with these agreements was, is and/or will be a substantial factor in directly and proximately causing damages and irreparable harm to Connection.  The amount of damages cannot reasonably be ascertained at present but will exceed $75,000.

72.     Unless restrained by this Court, Clutch will continue its unlawful actions and Connection will continue to be irreparably harmed.

73.     Connection will not have an adequate remedy at law for the harm and damage which Clutch's tortious interference with Witts' and Luongo's agreements will cause and is entitled to a preliminary and permanent injunction, enjoining Clutch from further unlawful acts.

### REQUESTS FOR RELIEF

WHEREFORE, Connection requests that this Court award the following relief:

A.     Enter judgment in favor of Connection on all Counts in the present Complaint;

B.     Award damages to Connection in an amount to be determined at trial;

C.     Award Connection its costs, interest, and reasonable attorneys' fees;

D.     Issue a preliminary and permanent injunction prohibiting Defendants from taking any action inconsistent with Witts' or Luongo's obligations under their Agreements, including retaining, using or disclosing Connection's Confidential Information, or directly or indirectly soliciting Connection's customers, prospective customers or employees, or, Defendant Witts providing services to Clutch or any Connection competitor, or accepting or continuing employment with Clutch or any Connection competitor, for 18 months following the issuance of such injunction; and

E.     Award Connection such other relief as this Court deems just and proper.

Dated: May 13, 2022

Respectfully submitted,

PC CONNECTION, INC.

By its attorneys,

/s/     *Samuel H. Martin*
Samuel H. Martin (NHBA# 272195)
JACKSON LEWIS P.C.
100 International Drive, Suite 363
Portsmouth, NH 03801
Phone: (603) 559-2700
Fax: (603) 559-2701
samuel.martin@jacksonlewis.com

Erik Winton (*pro hac vice* forthcoming)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Fl.
Boston, MA 02116
Phone: (617) 367-0025
Fax: (617) 367-2155
erik.winton@jacksonlewis.com

## **VERIFICATION**

I, Heather J. Nehiley, under penalty of perjury, verify that I am the Senior Director, Employee Relations & Compliance of PC Connection, Inc., and that the facts in the above Verified Complaint my knowledge, or true to the best of my information and belief if compiled by others.

Date: May 12, 2022                                           By: _____


STATE OF NEW HAMPSHIRE
COUNTY OF HILLSBOROUGH

Personally appeared before me, the above-named *Heather Nehiley*,  who made oath that the above statements are true to the best of his knowledge and belief.

Date: 5/12/2022                                 _____
                                                              Justice of the Peace/Notary Public

My commission expires:

4857-9377-2830, v. 7

State of New Hampshire   County of *Hillsborough*
Subscribed and sworn to (or affirmed) before me on this 12th day
of *May*, 20 22 by *Ann Christmas*
_____
                                 **Notary Public Signature**